UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
: 
COREY LASHLEY, : **MEMORANDUM**
: **DECISION AND ORDER**
Plaintiff, :
: 13 Civ. 2683 (BMC)
- against - :
:
NEW LIFE BUSINESS INSTITUTE, INC., and :
SHEILA FLYNN a/k/a Sheila Allen, :
:
Defendants. :
:
---------------------------------------------------------- X

**COGAN**, District Judge.

In this Title VII action, a jury returned a verdict of $10,000 compensatory and $30,000 punitive damages against defendants Sheila Flynn and New Life Business Institute, Inc. ("NLBI"). Defendants have moved for judgment as a matter of law or, in the alternative, for a new trial. The motion is granted only to the extent of setting aside the jury's verdict as to plaintiff's retaliation claim. For the reasons stated below, a new trial on damages is unnecessary, and the jury's damages award is upheld.

## BACKGROUND

**I. Overview**

Defendant Flynn is the president of NLBI, a health care training facility which trains the underprivileged in medical billing and becoming medical assistants. She started NLBI in 2001 and has been operating the facility since. On April 7, 2012, she met plaintiff Corey Lashley at a club in Queens. This encounter led to both a romantic relationship, which lasted for several months, and plaintiff's employment at NLBI as an admissions recruiter. While plaintiff was still

employed at NLBI, he attempted to break up with defendant Flynn.  In response, Flynn became angry, sending plaintiff a flurry of text messages, including one that told plaintiff he should quit.  She continued to pursue him romantically, though, and she engaged in sexual acts with plaintiff in her office.  Eventually, plaintiff was terminated.  Plaintiff later filed a complaint against defendants alleging sexual harassment and retaliation in violation of Title VII.  After a four-day trial, the jury found in favor of plaintiff as noted above.

## II.  The Trial

The bulk of the testimony at trial was from plaintiff himself.  Plaintiff testified that on April 7, 2012, defendant Flynn approached him at a club in Queens called "Club Area."  The two began talking, and eventually defendant Flynn told plaintiff that "she [could] change [his] life."  She offered plaintiff a job advertising for NLBI and invited him back to her house to "speak about the possible employment."  At Flynn's house, Flynn took plaintiff to her bedroom, gave him an alcoholic drink, and they began to discuss plaintiff's past job experience and whether he would be able to attract new students to the school.  At some point that night, Flynn approached plaintiff and kissed him.  Plaintiff was "a little reluctant" but returned Flynn's affections because he was thinking about the job she was offering him.  They had sex that night.  Afterwards, defendant Flynn told Lashley to come to NLBI to interview on Monday, but that the interview would be just a "formality" because he already had the job.

Plaintiff went to NLBI the following Monday and began work as an employee.  Later that night, plaintiff called persons he had previously had worked with, including Rene Towles and his cousin Tyrone Lashley, to be part of his "street team" that would help advertise NLBI to prospective students.

From the beginning of plaintiff's employment, defendant Flynn would tell plaintiff to come to her house at night. Plaintiff testified that he had intended to discuss work at Flynn's house, "but ultimately [they] had sex." He said he "did what [he] had to do to get where [he] had to go" and that he was "doing what [he] had to do to be able to provide for [his] child. [He] didn't like it. But [he] accepted it for what it was."

Around April 23rd, the mother of plaintiff's child returned to town, which, according to plaintiff, made Flynn angry because plaintiff spent more time with his child and his child's mother, rather than with her. Flynn would "slam doors, kick garbage cans over." At one point, plaintiff took Flynn to her office and tried to calm her down. Flynn then told plaintiff that he was her "problem." She started to grab plaintiff and ultimately gave him oral sex inside her office.

A couple weeks later, plaintiff started "feeling bad" about his affair with defendant Flynn, so he began avoiding her. He told Flynn that he was "done with this" and that he "d[idn't] want to do it anymore." In response, Flynn told plaintiff that she could "provide" for him, including paying his child support and purchasing for him "an all new white Range Rover." She continued to get angry about plaintiff seeing his child and his child's mother.

At some point around the end of May, plaintiff and Flynn were in her office, when Flynn started "grabbing" plaintiff and "rubbing on [his] body." Ultimately, she unzipped his pants and gave him oral sex. Plaintiff testified that he "just felt like crap" afterwards.

At work in May, defendant Flynn asked plaintiff to fill out an application for a license, which plaintiff filled out. Flynn told plaintiff not to "worry about it" and "it is nothing to stress."

Eventually, Flynn began to direct plaintiff to fire members of his street team, including Towles and another employee named Kareem Smith. According to plaintiff, Flynn "ma[d]e up reasons that didn't exist" in order to fire members of plaintiff's street team, despite the fact that his street team had helped attract a number of new students to the school. When plaintiff asked Flynn why she was instructing him to fire members of his street team, she responded, "because I'm the boss, I control the situation." Plaintiff believed that the true reason Flynn was acting this way was because she was angry that he "didn't want to leave [his] baby mother and [his] child."

Defendant Flynn also forced plaintiff to take an unpaid, two-week vacation, stating that she needed two weeks to "get over" plaintiff and did not want to see him during that period. She sent plaintiff a text message saying, "[A]nything worth having is a struggle. Always remember that. It is easy to quit." However, defendant Flynn later sent plaintiff a text message saying that there was no need for him to take a vacation. Plaintiff testified that these text exchanges made him feel "bad," "like she was pressuring me, stalking me."

At one point, plaintiff resigned but then came back to work the next day because he "needed the money." Soon thereafter, defendant Flynn sent plaintiff a message stating, "you should quit, it is not going to be nice." Plaintiff interpreted this as an indication that he should quit.

On July 2nd, plaintiff was terminated from NLBI. He was told that he was fired because of "a problem with one of [his] guys, [his] worker's pay, and [plaintiff] went in defense of him because he didn't get all of his money," and therefore plaintiff was "not on [defendant Flynn's] side." However, plaintiff testified that defendant Flynn told him the true reason he was fired was because he did not want to sleep with her anymore.

4

At trial, plaintiff also called Towles, Tyrone Lashley, and Shanee Brown, all former employees at NLBI, to testify on his behalf. They all testified that they were terminated from NLBI. Tyrone Lashley and Brown both testified that they were not aware of any license or certificate requirement for an admissions agent.

Defendants called three witnesses: Derwin Spencer, Deloris Mitchell, and defendant Flynn herself. Both Spencer, who is Flynn's brother, and defendant Flynn testified as to their understanding of the relationship between Flynn and plaintiff; that it was romantic and consensual. Defendant Flynn also testified that she had never had sex or oral sex in her office with plaintiff. Mitchell, an educational consultant for NLBI, testified as to the licensing requirements to work in admissions. She testified that she had spoken to plaintiff "on a few occasions about the licensing requirement," "at least four or five times regarding his individual license application." Mitchell stated that Flynn would talk to plaintiff and tell him "if for any reason, he did not submit his paperwork, then maybe we're going to have to let him go."

On defendant Flynn's cross-examination, she testified that on December 4th, after plaintiff had engaged counsel for the present case, she sent a letter to plaintiff's attorney stating that plaintiff "was terminated due to his past criminal history which makes it impossible to obtain proper State Licenses needed to legally fill his job position as an Admissions Agent." At trial, plaintiff testified that he had never been informed that the reason he was not allowed to continue working was his past criminal history and that he had told Flynn of his criminal history when they first met.

Defendant Flynn also testified that NLBI had a sexual harassment policy as of April 9, 2012, and that she had been trained in sexual harassment discrimination "at every job [she]'d ever worked on."

**DISCUSSION**

**I. Standard of Review**

In considering a motion for judgment as a matter of law, "the district court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" Zellner v. Summerlin, 494 F.3d 344, 370 (2d Cir. 2007) (quoting Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2000)). Even though the district court "'should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*.'" Id. (quoting Reeves, 530 U.S. at 150-51, 120 S. Ct. at 2110) (emphasis in original). Granting a motion for judgment as a matter of law "is warranted 'only if, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror would be *compelled* to find in favor of the moving party.'" Kroshnyl v. U.S. Pack Courier Services, Inc., 771 F.3d 93, 107 (2d Cir. 2014) (quoting Tuccio v. Marconi, 589 F.3d 538, 540 (2d Cir. 2009)) (emphasis added).

On the other hand, a motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure faces a "less stringent standard" than a motion under Rule 50 for judgment as a matter of law. See Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003). When considering a motion for a new trial, "the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" ING Global v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 99 (2d Cir. 2014) (quoting Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012)). In fact, the district court may grant a new trial "'even if there is substantial evidence supporting the jury's verdict.'" Manley, 337 F.3d at 244 (quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir. 1998)). However, the court "must conclude that 'the jury has reached a seriously erroneous

result or . . . the verdict is a miscarriage of justice'" in order to grant a motion for a new trial. Id. at 245 (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)); see also ING Global, 757 F.3d at 99 (When "'a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice.'") (quoting Raedle, 670 F.3d at 418-19).

## II. *Quid Pro Quo* Sexual Harassment

Under Title VII, a plaintiff may seek relief for sex discrimination under two theories: (1) *quid pro quo* or (2) hostile work environment. Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-65, 106 S. Ct. 2399, 2404-05 (1986)). Plaintiff brought, and was successful at trial, under both theories.

"[T]o establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that []he was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of h[is] employment." Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994). In other words, if plaintiff is able to demonstrate that he suffered an economic injury "because of gender or because a sexual advance was made by a supervisor and rejected by h[im]," he may be entitled to recovery under Title VII. See Kotcher, 957 F.2d at 62; see also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006); Corrigan v. Labrum & Doak, No. 95 Civ. 6471, 1997 WL 76524, at *6 (S.D.N.Y. Feb. 21, 1997).

Here, plaintiff experienced a loss of a tangible job benefit; namely, he was fired. See Schiano, 445 F.3d at 604 (noting that "[a] tangible employment action usually 'constitutes a

7

significant change in employment status, such as hiring [or] firing"); Jin v. Metro. Life Ins. Co., 310 F.3d 84, 91 (2d Cir. 2002). In addition, defendant Flynn made sexual advances towards plaintiff; she repeatedly sent plaintiff flirtatious text messages, invited plaintiff to her house after work, and engaged in sexual contact with plaintiff at the office. There is little doubt that plaintiff rejected these sexual advances. He told defendant Flynn numerous times prior to his termination that he wanted to stop engaging in sexual relations with her and that he was angry she wanted him to leave his child and his child's mother for her.

Ultimately, plaintiff is able to prevail on his *quid pro quo* sexual harassment claim because, viewing the evidence in the light most favorable to plaintiff, the jury reasonably found a causal connection between plaintiff's termination at NLBI and his rejection of defendant Flynn's sexual advances. First, a causal connection between plaintiff's termination and his rejection of defendant Flynn's sexual advances can be inferred by the short time period between the two events. See Adenji v. Adm. for Children Serv., 43 F. Supp. 2d 407, 433 (S.D.N.Y. 1999) (citing cases). Plaintiff began to indicate to defendant Flynn that he "was feeling bad" about their relationship and that he wanted to stop seeing her around the beginning of May. However, he continued to have sex with defendant Flynn. Eventually they broke up, and defendant Flynn forced plaintiff to go on an unpaid two-week vacation so she could "get over" him, though she then rescinded requirement and allowed plaintiff to come back to work. Shortly thereafter, on July 2nd, plaintiff was terminated. The couple of weeks between their breakup and plaintiff's termination could lead the jury to infer that defendants fired plaintiff due to his refusal to have sex with defendant Flynn. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 1511 (2001) (noting that, in the retaliation context, temporal proximity that is "very close" can establish causation); Carter v. New York, 310 F. Supp. 2d 468, 478 n.5 (N.D.N.Y.

8

2004) (applying the issue of temporal proximity to the *quid pro quo* context and noting that a "very close" connection is "typically on the order of days or weeks, not months").

Second, and perhaps more importantly, defendant Flynn made an explicit threat to plaintiff. Once plaintiff stopped seeing defendant Flynn, she told him that she hated him and "hate[d] that [she] ha[d] to see [him] everyday." After plaintiff refused to go to defendant Flynn's house and have sex with her, she sent a text message to him stating, "you should just quit, it is not going to be nice." Plaintiff interpreted this text message to mean that he should just quit working at NLBI, because she had the power to make his life difficult as a result of him not continuing a romantic relationship with her. The jury was entitled to credit this testimony by plaintiff, as well as take note of the fact that plaintiff was ultimately fired. Where the employer "ma[kes] and threaten[s] to make decisions affecting the terms and conditions of [plaintiff's] employment based upon [his] submission to h[er] sexual advances," the employer's conduct constitutes *quid pro quo* harassment. See Karibian, 14 F.3d at 778.

Defendants' response is two-fold. First, defendants argue that plaintiff and defendant Flynn had a consensual relationship and that there is therefore a presumption against *quid pro quo* sexual harassment, relying on Pipkins v. City of Temple Terrace, 267 F.3d 1197 (11th Cir. 2001). However, the Eleventh Circuit in Pipkins expressly stated that it was not deciding "that once a consensual relationship between a supervisor and a subordinate is established, the subordinate could never then become victim to *quid pro quo* sexual harassment by that supervisor subsequent to the termination of the relationship . . . ." 267 F.3d at 1201; see also Kohutka v. Town of Hempstead, 994 F. Supp. 2d 305, 328 (E.D.N.Y. 2014) (noting that "there is no *per se* bar against hostile work environment claims based on gender that arise, whether entirely or not, out of a failed consensual relationship"). While courts in this circuit have held

9

that "Title VII sex discrimination claims may not be premised solely on evidence of mistreatment following the termination of a romantic relationship," they have still noted that "[t]here are clearly circumstances in which an employee's failed romantic relationship with a supervisor can lead to an actionable Title VII claim, such as when the employee's subsequent mistreatment can be tied to the rejected supervisor's unwanted sexual advances or other inappropriate efforts to resume the relationship." Novak v. Waterfront Com'n of New York Harbor, 928 F. Supp. 2d 723, 729-30 (S.D.N.Y. 2013) (citations omitted). In Novak, there was no evidence that the defendant supervisor had made any sexual advances towards the plaintiff after their breakup, and therefore plaintiff did not have an actionable Title VII claim. In this case, plaintiff repeatedly tried to break up with defendant Flynn, but she kept attempting to get back together with plaintiff, even telling him that she would "provide for [him]," pay for his child support, and buy him "an all new white Range Rover."

This case is similar to Perks v. Town of Huntington, 251 F. Supp. 2d 1143 (E.D.N.Y. 2003), in that the plaintiff had told the defendant that he wanted to end their personal relationship, to which defendant "responded in an angry and threatening fashion and told him that she would remove him from his position." Id. at 1150. Like defendant Flynn, the defendant in Perks told plaintiff "that she was going to make things extremely difficult" and eventually did, by reducing his overtime (and therefore his compensation). Id. The court in Perks held that the defendant's retaliation for plaintiff's failure to resume sexual relations with her "fit[] into the quid pro model of sexual harassment." Id. at 1155. This is the conclusion that the jury has reached here, and I see no reason to disturb it.

The second argument that defendants present is that plaintiff's rejection of defendant Flynn's sexual advances was not a motivating factor for his termination; rather it was plaintiff's

disloyalty to defendant Flynn and his refusal to break off his relationship with his baby's mother that led to plaintiff's termination. Where, as here, plaintiff has established a prima facie case of *quid pro quo* sexual discrimination, the defendant "must then present a legitimate, non-discriminatory reason for the adverse employment action to rebut the presumption." Okon v. Appia, No. 06 Civ. 6810, 2008 WL 2245431, at *8 (E.D.N.Y. May 29, 2008) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S. Ct. 1089, 1094-95 (1981)). "The burden then shifts back to the plaintiff to prove that the stated reason is pretext, and ' . . . that discrimination was the real reason for the employment action.'" Id. (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)).

The problem defendants had here is that they presented multiple, inconsistent reasons for plaintiff's firing. Prior to trial, defendant Flynn stated that plaintiff was terminated due to his past criminal history and therefore could not obtain the proper state license for his job at NLBI. At trial, defendant Flynn testified that she told plaintiff that, if he brought in the required paperwork for the state license, he would be able to return to work. In their papers in support of the motion before me, defendants argue that plaintiff was terminated because he was disloyal to defendant Flynn and/or because he continued to see his baby's mother. The jury was entitled to take this evidence and determine that defendants were unable to present a cohesive, legitimate, non-discriminatory reason for plaintiff's termination. Even under the more lenient standard for a new trial, I see no miscarriage of justice with this result. Accordingly, defendants' motion on plaintiff's *quid pro quo* sexual harassment claim is denied.

### III. Hostile Work Environment Sexual Harassment

A hostile work environment in violation of Title VII exists "'[w]hen the workplace is permeated with disciplinary intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367 (1993)). A hostile work environment has both an objective and subjective component; it is "'considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.'" Id. (quoting Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 319 (2d Cir. 1999)). To determine whether a reasonable person would find a work environment hostile requires looking at the "totality of the circumstances," which include: "'(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance.'" Id. (quoting Brennan, 192 F.3d at 319). Generally speaking, to have a sufficient hostile work environment claim, plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment.'" Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000), superseded on other grounds by N.Y.C. Local L. No. 85) (internal quotation marks and citation omitted).

In this case, plaintiff testified that at one point, while he was talking to defendant Flynn in her office, she "started grabbing on [him], rubbing on [his] body" and ultimately gave him oral sex, which plaintiff testified made him feel bad. This unwanted physical contact and sex act alone are sufficient to find a hostile work environment. See Redd v. New York Div. of Parole, 678 F.3d 166, 177 (2d Cir. 2012) (noting that "'direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment'") (quoting Worth v. Tyer, 276

F.3d 249, 268 (7th Cir. 2001)); see also Richardson v. N.Y. State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999) ("Our law is clear, for example, that 'even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment' under Title VII.") (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)).

Additionally, there were other instances that plaintiff and his witnesses testified about that could lead the jury to conclude that defendant Flynn's behavior constituted "harassing conduct" that "detract[ed] from employees' job performance, discourage[d] employees from remaining on the job, or ke[pt] them from advancing in their careers." Harris, 510 U.S. at 21, 114 S. Ct.at 370-71. Defendant Flynn instructed plaintiff to fire members of his street team after plaintiff refused to leave his child's mother and continue his relationship with Flynn. By firing members of plaintiff's street team, defendant Flynn removed plaintiff's ability to do his job effectively.

On these facts, it was reasonable for the jury to conclude that this behavior constituted a hostile working environment in violation of Title VII. See Gregory v. Daly, 243 F.3d 687, 693 (2d Cir. 2001) (citing Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000)). Again, even under the more lenient standard for a new trial, I cannot say the jury's conclusion was seriously erroneous. Therefore, defendants' motion on plaintiff's hostile work environment sexual harassment claim is denied.

**IV. Retaliation**

To establish a retaliation claim under Title VII, "the employee must show that he was engaged in a protected activity; that the employer was aware of that activity; that there occurred an employment action adverse to the employee; and that there existed a causal connection

13

between the protected activity and the adverse employment action." Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (citing cases). As to the first element, whether plaintiff engaged in a protected activity, a "'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176, 188 (E.D.N.Y. 2012) (quoting Cruz, 202 F.3d at 566). "Internal or informal complaints of discrimination on a basis prohibited by Title VII are protected activity." Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 239 (N.D.N.Y. 2010) (citing Raniola v. Bratton, 243 F.3d 610, 624-25 (2d Cir. 2001)).

However, in the instant case, plaintiff never testified that he made a complaint, whether formal or informal, to Flynn or anyone else at NLBI that he was being discriminated against. He only told Flynn that he was "done with" their relationship and that he "d[idn't] want to do it anymore." The only action that he took was to oppose defendant Flynn's sexual advances.

The Second Circuit has not explicitly ruled on whether resisting the sexual advances of an employer constitutes a "protected activity" for purposes of a plaintiff's retaliation claim. See Fitzgerald v. Henderson, 251 F.3d 345, 366 (2d Cir. 2001) (declining to rule on district court's ruling that "rejection of sexual advances is not a protected activity under Title VII"); Garrigan v. Ruby Tuesday, Inc., No. 14 Civ. 155, 2014 WL 2134613, at *6 (S.D.N.Y. May 22, 2014). However, I find that the rejection of an employer's sexual advances by itself cannot constitute a "protected activity" under Title VII. Judge Glasser's holding in Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012), is particularly instructive here:

> If resisting the advances of a harasser constitutes a "protected activity," then "every harassment claim would automatically state a retaliation claim as well." Del Castillo v. Pathmark Stores, 941 F. Supp. 437, 439 (S.D.N.Y. 1996). Moreover, one of the key purposes of the retaliation provisions in anti-discrimination statutes such as Title VII . . . is "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance

14

enforcement of the [statute's] basic guarantees." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S. Ct. 2405, 2412 (2006). But if one makes no effort to secure or advance the guarantees of an anti-discrimination statute by taking any action in response to allegedly discriminatory conduct, there can be nothing for the employer to interfere with.

See also LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 389 (5th Cir. 2007); Raeman v. County of Ontario, No. 12 Civ. 6009, 2013 WL 956758, at *9 (W.D.N.Y. Mar. 12, 2013).

Because I find that, even viewing all the evidence in the light most favorable to plaintiff, plaintiff did not engage in a protected activity, plaintiff's retaliation claim under Title VII must fail as a matter of law and defendants' motion is granted as to this claim. However, there need not be a new trial on the jury's award of compensatory and punitive damages. See Turley v. Police Dep't of City of New York, 167 F.3d 757, 760 (2d Cir. 1999) ("Before a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt 'to reconcile the jury's findings, by exegesis if necessary.'") (quoting Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 119, 83 S. Ct. 659, 666 (1963)). It is clear here that plaintiff's injuries resulted from his *quid pro quo* and hostile work environment sexual harassment claims, and not from his retaliation claim. There is no reason to think the jury did not consider this when awarding plaintiff damages. Accordingly, the award of $10,000 in compensatory damages and $30,000 in punitive damages stands. See Aczel v. Labonia, 584 F.3d 52, 59 (2d Cir. 2009).

## V. Plaintiff's Punitive Damages Award

A. *Defendants are not entitled to judgment as a matter of law.*

Pursuant to Title VII, a plaintiff may recover punitive damages where the plaintiff demonstrates that the defendant "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In order to establish malice or reckless indifference, a plaintiff need not show that

the defendant committed egregious or outrageous acts. Cush-Crawford v. Adchem Corp., 271 F.3d 352, 356 (2d Cir. 2001). Rather, a plaintiff need only demonstrate that the defendant had the "requisite state of mind" of malice or reckless indifference. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 538, 119 S. Ct. 2118, 2126 (1999); see also Luciano v. Olsten Corp., 110 F.3d 210, 219-20 (2d Cir.1997). Specifically, a plaintiff seeking to establish this must demonstrate that the "employer . . . at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." Kolstad, 527 U.S. at 536, 119 S. Ct. at 2125.

Defendants have not shown that the evidence was insufficient for a reasonable jury to find that defendants engaged in a discriminatory practice with malice or reckless indifference to plaintiff's federally protected rights. Defendant Flynn's own testimony at trial indicated that she had been trained in sexual harassment discrimination "at every job [she]'d ever worked on" and that NLBI had a sexual harassment policy. Nonetheless, there was evidence at trial that defendant Flynn repeatedly harassed plaintiff through unwanted sexual advances and sex acts in the workplace after plaintiff had stated that he no longer wanted to be in a romantic relationship with Flynn. There was also evidence that defendant Flynn fired plaintiff because he was unwilling to engage in these sex acts.

On this record, there was sufficient evidence for a reasonable jury to conclude that defendants perceived the risk that their actions would violate federal law but discriminated anyway. In such circumstances, punitive damages are available to plaintiff. Kolstad, 527 U.S. at 536, 119 S. Ct. at 2125. Thus, defendants' motion for judgment as a matter of law on the punitive damages award is denied.

B. *The punitive damages award should not be remitted.*

Punitive damage awards are subject to constitutional limitations. Honda Motor Co. v. Oberg, 512 U.S. 415, 420, 114 S. Ct. 2331, 2335 (1994). Accordingly, courts reviewing punitive damages awards consider three guideposts: (1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S. Ct. 1513, 1520 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598-99 (1996).

The degree of reprehensibility of the defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Gore, 517 U.S. at 575, 116 S. Ct. at 1599. In assessing the reprehensibility of a defendant's conduct, courts consider whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." Campbell, 538 U.S. at 419, 123 S. Ct. at 1521.

Under these standards, defendants' conduct was reprehensible. The trial testimony indicates that defendant Flynn repeatedly used her position as plaintiff's employer to pressure him into engaging in sex acts in the workplace and elsewhere that he did not want to engage in. The testimony also indicates that, when plaintiff asked to put a stop to this sexual activity, defendants fired him. This conduct, which appears to have involved repeated actions over a period of time, against a target vulnerable to being terminated by defendants, and done with

malice or reckless indifference, is reprehensible under the standards set forth in Campbell. Although the compensatory damages awarded consisted of lost pay, "economic harm can merit the imposition of a punitive damages award, and some courts have noted the relative reprehensibility of intentional discrimination as distinguished from some other forms of purely economic injury."  Thomas v. iStar Fin., Inc., 652 F.3d 141, 148 (2d Cir. 2011); see also Motorola Credit Corp. v. Uzan, 509 F.3d 74, 87 (2d Cir. 2007).

Turning to the second guidepost, the disparity between the actual or potential harm suffered by plaintiff and the punitive damages awarded, while the Supreme Court has "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed," it has nonetheless recognized that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" and "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."  State Farm, 538 U.S. at 424-25, 123 S. Ct. at 1524 (citing Gore, 517 U.S. at 581, 116 S. Ct. at 1602 and Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 1046 (1991)).  Here, the disparity between the punitive damages award and the compensatory damages award is 3-to-1.  The jury awarded plaintiff $10,000 in compensatory damages for lost wages, and imposed a punitive damages award of $30,000.  Given the discrimination and harassment inflicted by defendants, such a ratio is not inappropriate.  Under Campbell, the 3-to-1 ratio is entirely consistent with due process.

The final guidepost is the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases.  Although Title VII does not provide for civil penalties, the New York City Administrative Code provides for civil penalties of up to $125,000 for an unlawful discriminatory practice and up to $250,000 if the discriminatory

18

practice was the result of a "willful, wanton or malicious act" or if discriminatory harassment or violence occurred.  N.Y. City Admin. Code § 8–126(a).  Courts have made reference to this Administrative Code provision in evaluating whether punitive damages awards under Title VII are consistent with due process.  See Thomas, 652 F.3d at 149; Zakre v. Norddeutsche Landesbank Girozentrale, 541 F. Supp. 2d 555, 565 (S.D.N.Y. 2008).  Though no such penalty was awarded here, the fact that a civil penalty of $125,000 or $250,000 is authorized for reasonably comparable unlawful practices confirms that the $30,000 punitive damages award here was not inconsistent with due process.

In sum, in light of the degree of reprehensibility of defendants' conduct, the 3-to-1 ratio of punitive to compensatory damages, and the fact that the $30,000 punitive damages award is less than comparable civil penalties, the punitive damages award is consistent with due process and need not be remitted.

## CONCLUSION

For the reasons stated above, defendants' motion is denied as to all claims except for plaintiff's retaliation claim.  Plaintiff's damages award is upheld.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
        March 9, 2015